# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| VAN L. SCHMICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CV69 HEA(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Van L. Schmick for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 17). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On April 20, 2004, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on February 15, 1997. (Tr. 89-91). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated April 28, 2006. (Tr. 68-72, 14-21). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on March 6, 2007.  (Tr. 10, 3-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on October 17, 2005.  (Tr. 24).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).  The ALJ indicated that plaintiff's application for benefits was denied by the SSA on the basis that plaintiff's disability did not arise until after June 30, 2002, plaintiff's date last insured.  (<u>Id.</u>).  Plaintiff's attorney stated that she had explained this to plaintiff.  (<u>Id.</u>).  The ALJ next admitted the exhibits into evidence.  (Tr. 25).

Plaintiff's attorney then made an opening statement.  (<u>Id.</u>).  She stated that plaintiff suffers from end stage renal damage.  (<u>Id.</u>).  Plaintiff's attorney indicated that plaintiff worked at an auto parts store until 1997, at which time he found it difficult to walk and lift.  (<u>Id.</u>).  Plaintiff's attorney stated that plaintiff was not diagnosed with end stage renal damage until 2004.  (<u>Id.</u>).  Plaintiff's attorney argued that, even though plaintiff was not diagnosed until 2004, he had been experiencing the physical symptoms associated with end stage renal damage since 1997, prior to his date last insured.  (<u>Id.</u>).  She stated that plaintiff had had diabetes since ten years prior to the time he was diagnosed with end stage renal damage.  (<u>Id.</u>).  Plaintiff's attorney indicated that plaintiff switched doctors in 2004.  (<u>Id.</u>).

The ALJ then examined plaintiff, who testified that he was 58 years of age and was married.  (<u>Id.</u>).  Plaintiff stated that he lives with his wife, his fifteen-year-old son, and his eleven-year-old daughter.  (Tr. 27).  Plaintiff testified that his wife works outside the home.  (<u>Id.</u>).

Plaintiff stated that his wife is a computer operator for Poplar Bluff Regional Medical Center. (Id.).

Plaintiff testified that he has not worked since 1997. (Id.). Plaintiff stated that in 1997, he worked at City Auto Parts at the parts counter. (Id.). Plaintiff testified that he inventoried parts, and stocked shelves at this position. (Id.). Plaintiff stated that he worked at this position for nine months. (Id.). Plaintiff testified that he quit this position because he could no longer lift the crates or stand on his feet all day behind the counter. (Id.). Plaintiff stated that his wife was working at the hospital at this time. (Tr. 28). Plaintiff testified that he discussed quitting his job with his wife and his wife agreed that he should quit due to his health. (Id.).

Plaintiff stated that he did not apply for Social Security benefits when he quit his job in 1997 because he did not know anything about them at that time. (Id.). Plaintiff testified that he first learned about Social Security benefits through St. Francis Hospital. (Id.). Plaintiff stated that when he was diagnosed with end stage renal disease[1] in 2004, he was told by St. Francis Hospital staff that his children should apply for Social Security benefits. (Id.).

Plaintiff testified that when he was diagnosed with end stage renal disease in April 2004, his doctors told him that he acquired the condition due to polycystic kidney disease,[2] which is

---

[1]End stage renal disease, or renal failure, is the loss of renal function, either acute or chronic, that results in azotemia (an abnormal increase in concentration of urea and other nitrogenous substances in the blood), and syndrome of uremia (the complex of symptoms due to severe persisting renal failure that can be relieved by dialysis). See Stedman's Medical Dictionary, 699 (28th Ed. 2006).

[2]A progressive disease characterized by formation of multiple cysts of varying size scattered diffusely throughout both kidneys, resulting in compression and destruction of renal cells, usually with hypertension, gross hematuria, and uremia leading to progressive renal failure. Stedman's at 1029.

hereditary. (Id.). Plaintiff stated that his kidneys just stopped functioning. (Id.). Plaintiff testified that he undergoes dialysis three times a week. (Id.). Plaintiff stated that each dialysis session lasts four hours and fifteen minutes. (Tr. 29). Plaintiff testified that he started undergoing dialysis in April 2004, during an emergency. (Id.). Plaintiff explained that he presented for a doctor's appointment with a nephrologist, Dr. Frank Braxton, at which time he was shaking and was unable to walk. (Id.). Plaintiff stated that Dr. Braxton diagnosed him with renal failure and had him rushed to St. Francis Hospital for dialysis. (Id.). Plaintiff testified that he currently goes to Poplar Bluff Dialysis Center for dialysis. (Id.).

Plaintiff stated that he changed primary physicians in 2004 to Dr. Steven Nash.[3] (Id.). Plaintiff testified that he is a Type II diabetic[4] and was experiencing diabetic neuropathy[5] that was going undiagnosed. (Id.). Plaintiff stated that his feet were going numb to the point that he could not stand or walk. (Id.). Plaintiff testified that Dr. Nash diagnosed the diabetic neuropathy and put him on medication. (Id.). Plaintiff stated that this allowed him to use his feet and legs again. (Id.).

Plaintiff testified that when he reported the problem with his feet and legs to his previous doctor, he would prescribe ibuprofen, which is not recommended for renal patients. (Tr. 30).

---

[3]There are no medical records from nor any reference to a Dr. Steven Nash in the medical record. There are, however, extensive medical records from Dr. Stephen Nagy, dated from November 2000 through June 2005. As such, the undersigned assumes that plaintiff was referring to Dr. Nagy rather than Dr. Nash.

[4]A condition characterized by high blood glucose levels caused by a total lack of insulin. Occurs when the body's immune system attacks the insulin-producing beta cells in the pancreas and destroys them. See Stedman's at 530.

[5]A generic term for any diabetes mellitus related disorder of the peripheral nervous system, autonomic nervous system, and some cranial nerves. Stedman's at 1313.

Plaintiff stated that the ibuprofen took an extra toll on his kidneys and it did not stop the pain. (Id.). Plaintiff testified that he was experiencing the pain in his feet and legs in 1997. (Id.). Plaintiff stated that it took him seven years to find out what was wrong because he did not know of another doctor to see. (Id.). Plaintiff testified that his wife suggested that he see Dr. Nash because she heard of him through her job at the hospital. (Id.). Plaintiff stated that his previous doctor should have diagnosed his problem in 1997. (Id.). Plaintiff testified that Dr. Nash referred him to an endocrinologist when he realized that his diabetes was affecting his legs and feet. (Id.).

Plaintiff stated that his primary care doctor prior to Dr. Nash with which he was dissatisfied was Dr. Matt Riffle. (Tr. 31). Plaintiff testified that Dr. Riffle's office is located in Poplar Bluff. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he quit his job in 1997 because he was unable to carry the 100 to 150 pound crates as was required by the position. (Id.). Plaintiff stated that he was also unable to work on the computer because it required standing all day. (Tr. 32). Plaintiff testified that his legs and feet burned and ached and felt as if they were frost-bitten. (Id.).

Plaintiff stated that the problems with his legs and feet worsened in the five years after he stopped working. (Id.). Plaintiff testified that he was unable to walk up the short set of stairs at his home leading to his driveway. (Id.). Plaintiff stated that he had to sit down and move from one step to the next to get up the steps. (Id.). Plaintiff testified that the pain in his feet and legs was fairly constant and that it still was at the time of the hearing. (Id.). Plaintiff rated the pain he experienced from 1997 through 2002 as a ten on a scale of one to ten. (Id.). Plaintiff testified that the pain would bring tears to his eyes as he sat on the steps waiting. (Id.). Plaintiff stated

that he took ibuprofen for the pain and he also took insulin and some other medications that are no longer on the market. (Tr. 33). Plaintiff testified that he stopped working due to the pain. (Id.). Plaintiff stated that the pain has progressively gotten worse. (Id.).

Plaintiff testified that during the time period of 1997 through 2002, he did his children's laundry, made his bed, washed dishes while taking breaks to sit down, and cooked small meals that did not require significant standing. (Id.). Plaintiff stated that he was not able to mow the lawn or do other yard work. (Id.). Plaintiff testified that he was not experiencing memory problems at that time. (Id.).

The ALJ then re-examined plaintiff, who testified that in 1997, he would have been restricted to standing and walking for a couple hours over the course of a day. (Tr. 34). Plaintiff stated that he spent most of his time either seated with his feet elevated or lying down. (Id.). Plaintiff testified that these positions seemed to ease the pain, although he still experienced cold burning and cramps in the calves. (Id.).

Plaintiff stated that he has consistently received dialysis three times a week since the first emergency session. (Id.). Plaintiff testified that he is on a transplant list. (Id.). Plaintiff stated that his doctors told him that he would need dialysis until he receives a transplant. (Id.).

Plaintiff's attorney then re-examined plaintiff, who testified that during the period of 1997 through 2002, he was able to stand for fifteen to twenty minutes before he had to sit down and rest his legs. (Id.). Plaintiff stated that he was able to carry about twenty pounds regularly during that time period. (Tr. 35). Plaintiff testified that he was not having any problems with his hands or fingers at that time. (Id.). Plaintiff stated that he was healthy during this time other than his kidney and diabetes problems. (Id.).

The ALJ then questioned plaintiff, who testified that he does not receive any Veteran's Administration (VA) benefits. (Id.). Plaintiff stated that he does not go to the VA to see doctors. (Id.). Plaintiff testified that he was in the military for twenty years. (Id.). Plaintiff stated that he receives military retirement pay. (Id.). Plaintiff testified that he started drawing military retirement in 1988. (Id.). Plaintiff stated that he also draws ten percent disability from the military because he underwent surgery in 1974 to remove a kidney stone. (Tr. 36).

Plaintiff's attorney then resumed questioning plaintiff, who testified that he did not suffer any other problems during the relevant time period. (Id.). Plaintiff stated that since he changed doctors, he is now able to walk and stand. (Id.). Plaintiff testified that he still cannot perform yard work but he no longer crawls up the stairs in his backyard. (Id.). Plaintiff stated that from 1997 through 2002 he had to crawl up the stairs because he was unable to walk. (Id.).

The ALJ then re-examined plaintiff, who testified that he would be unable to stand at a cash register all day at the time of the hearing because his calves would cramp. (Id.). Plaintiff stated that he is able to stand or walk two to two-and-a-half hours in a day before he becomes weak and bends over. (Tr. 37).

Plaintiff testified that he waited so long to switch doctors because he trusted his doctor because his doctor was recommended by family members. (Id.). Plaintiff stated that he did not look for another doctor until his wife became concerned and found another doctor through her job at the hospital. (Id.).

Plaintiff testified that his wife drove him to the hearing. (Id.). Plaintiff stated that his wife had to take off work to attend the hearing. (Id.). The ALJ indicated that he would like plaintiff's wife to testify. (Id.).

Plaintiff's attorney stated that she requested medical records from Dr. Riffle but his office indicated that plaintiff was not a patient. (Tr. 38). Plaintiff stated that he started seeing Dr. Riffle in the early 1990s. (Id.). Plaintiff testified that he switched to Dr. Nash in 2004. (Id.). The ALJ suggested that plaintiff clear up this dispute with Dr. Riffle's office and obtain Dr. Riffle's records. (Id.). Plaintiff testified that he complained to Dr. Riffle about the pain in his feet. (Id.). Plaintiff stated that his complaints should be reflected in Dr. Riffle's records. (Tr. 39).

The ALJ then examined plaintiff's wife, Marilyn Schmick, who testified that she has been married to plaintiff since 1973. (Id.). Mrs. Schmick stated that plaintiff stopped working at the auto parts store in 1997 because it was too hard on him physically. (Id.). Mrs. Schmick testified that plaintiff had injured his toe and it was really difficult for him to walk. (Id.).

Mrs. Schmick stated that she was aware that plaintiff changed doctors in 2004. (Tr. 40). Mrs. Schmick testified that plaintiff's legs were hurting so bad that he could barely walk. (Id.). Mrs. Schmick stated that she believed that the medication plaintiff was taking was causing his leg problems. (Id.). Mrs. Schmick testified that she believed plaintiff was getting worse under the care of his former doctor. (Id.). Mrs. Schmick stated that she helped plaintiff find his new doctor because plaintiff's condition became worse. (Id.). Mrs. Schmick testified that plaintiff could barely climb the steps at his home because he was breathless and his legs hurt. (Tr. 41).

Mrs. Schmick stated that plaintiff did not try to go back to work after 1997 because he lacked the physical stamina. (Id.).

The ALJ indicated that he would grant plaintiff thirty days to update the medical records and try to get Dr. Riffle's records. (Id.). Plaintiff testified that Dr. Riffle was his doctor from 1997 until 2004. (Id.). Plaintiff stated that Dr. Riffle was his doctor through his date last insured.

(Tr. 42).  Plaintiff testified that he did not see any doctor other than Dr. Riffle during that time period.  (Id.).

The ALJ indicated that he would leave the record open so that Dr. Riffle's records could be obtained.  (Id.).  He stated that he would review all of the evidence again when he received Dr. Riffle's records.  (Id.).

### B.    Relevant Medical Records

Plaintiff presented to Matthew J. Riffle, M.D. on March 25, 1996, for a follow-up regarding his diabetes mellitus[6] and hypertension.[7]  (Tr. 149).  Dr. Riffle indicated that plaintiff was "not doing well at all."  (Id.).  Plaintiff complained of neuropathy pains, bilateral heel pain, extreme fatigue and total impotence since starting Zestril.[8]  (Id.).  Upon physical examination, plaintiff's lungs were clear, he had a regular heart rate and rhythm, normal extremities, and a normal neurological examination. (Id.).  Dr. Riffle's assessment was diabetes mellitus, out of control; impotence, probably secondary to Zestril; and hypertension.  (Id.).  Dr. Riffle switched plaintiff to Norvasc[9] and increased his dosage of insulin.  (Id.).  Dr. Riffle stated that he had explained to plaintiff that he was on a rapid decline and that he must change his lifestyle, lose weight, control his blood sugar levels and blood pressure or he

---

[6]A chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced.  It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, glycosuria (urinary excretion of carbohydrates), water and electrolyte loss, ketoacidosis (a pathological state caused by the enhanced production of ketone bodies), and coma.  See Stedman's at 529.

[7]High blood pressure.  Stedman's at 927.

[8]Zestril is indicated for the treatment of hypertension.  See Physician's Desk Reference (PDR), 692 (57th Ed. 2003).

[9]Norvasc is indicated for the treatment of hypertension.  See PDR at 2619.

will suffer premature morbidity or mortality.  (Id.).  Plaintiff indicated that he would try to do better.  (Id.).

In a letter dated March 28, 1996, Dr. Riffle stated that he had followed plaintiff for some time for his diabetes and that plaintiff failed non-insulin therapy (diet and oral hypoglycemic agents).  (Tr. 150).  Dr. Riffle stated that plaintiff was started on insulin in December 1992 and that he has been doing extremely well since then.  (Id.).  Dr. Riffle indicated that plaintiff needs to continue to monitor his blood sugars at home.  (Id.).

On April 4, 1996, plaintiff reported feeling worse and more lethargic since being placed on Norvasc.  (Tr. 148).  Plaintiff denied chest pain or shortness of breath.  (Id.).  Plaintiff indicated that he was trying to watch his diet much more compulsively.  (Id.).  Dr. Riffle's assessment was hypertension and diabetes mellitus.  (Id.).  He started plaintiff on Dilacor.[10]  (Id.).

Plaintiff presented to Dr. Riffle for a follow-up regarding his diabetes and hypertension on July 2, 1996.  (Tr. 148).  Plaintiff reported that he was doing well, although he had a very stressful job and works 66 hours a week.  (Id.).  Upon physical examination, plaintiff's lungs were clear, and his heart rate and rhythm were regular.  (Id.).  Dr. Riffle's assessment was diabetes, hyperlipidemia,[11] and hypertension.  (Id.).  Dr. Riffle prescribed Accupril,[12] ibuprofen, and Dilacor.  (Id.).

On September 25, 1996, Dr. Riffle stated that plaintiff was doing "reasonably well," although he developed some edema from Adalat.  (Tr. 147).  Plaintiff's blood sugars were doing

---

[10]Dilacor is indicated for the treatment of hypertension.  See PDR at 2532.

[11]Elevated levels of lipids in the blood plasma.  Stedman's at 922.

[12]Accupril is indicated for the treatment of hypertension.  See PDR at 2520.

"okay." (Id.). Plaintiff's lungs were clear and his heart rate and rhythm normal. (Id.). Plaintiff's extremities were also normal. (Id.). Dr. Riffle's assessment was: bilateral edema, probably due to Adalat; diabetes, better control; and osteoarthritis[13] of the knees and fingers. (Id.). Dr. Riffle prescribed ibuprofen and Accupril. (Id.).

Plaintiff saw Dr. Riffle for a follow-up on February 19, 1997. (Tr. 147). Dr. Riffle indicated that plaintiff was finally on a diet. (Id.). Plaintiff's lungs were clear, heart examination was regular, and his extremities were normal. (Id.). Dr. Riffle's assessment was hypertension; diabetes; and impotence, probably related to Accupril. (Id.). Dr. Riffle decreased plaintiff's Accupril, continued plaintiff's current measures, and recommended that plaintiff continue his weight loss. (Id.).

Plaintiff saw Dr. Riffle on May 14, 1997, at which time he reported having trouble with insomnia and his blood pressure. (Tr. 146). Plaintiff's lungs were clear, heart rate and rhythm were normal, and extremities were normal. (Id.). Dr. Riffle's assessment was hypertension; diabetes, poorly controlled although improving; and impotence. (Id.). Dr. Riffle increased plaintiff's dosage of Accupril and recommended relaxation techniques. (Id.).

In a letter dated January 29, 1999, Frank W. Braxton, M.D., a nephrology specialist, indicated that plaintiff's diabetes was under excellent control with Accupril. (Tr. 606). He noted that plaintiff's blood pressure should be better controlled. (Id.).

Plaintiff presented to Peter Paulus, M.D. of Eye Surgery Consultants for a diabetic

---

[13]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

evaluation on April 19, 2000. (Tr. 548). Plaintiff saw Dr. Paulus again on August 2, 2000, and

on December 8, 2000. (Tr. 544-47). Dr. Paulus performed laser surgery of the right eye on

March 9, 2001. (Tr. 543). He performed laser surgery of the left eye on June 8, 2001. (Tr. 539).

Plaintiff continued seeing Dr. Paulus through June 2004. (Tr. 490-548).

Plaintiff saw Stephen Nagy, M.D. on November 13, 2000. (Tr. 714). Plaintiff reported

that he could not tolerate Avandia[14] as it caused him to be short of breath and weak. (Id.). Dr.

Nagy indicated that plaintiff's blood sugars were running well on Avandia and that they had been

running high the past week since plaintiff has been off the Avandia. (Id.). Dr. Nagy's assessment

was Type II insulin dependent diabetes with chronic renal failure[15] and hypertension. (Id.). Dr.

Nagy prescribed Actos,[16] discontinued the Avandia, and continued plaintiff on insulin. (Id.).

On November 27, 2000, plaintiff reported that he was feeling much better since switching

to Actos. (Tr. 713). Plaintiff's energy level was also improved. (Id.). Dr. Nagy continued

plaintiff on Actos. (Id.).

On January 10, 2001, plaintiff reported an episode of left sided chest pain two weeks prior

while driving. (Tr. 712). Plaintiff's blood sugars were under better control. (Id.). Plaintiff's

heart rate and rhythm were normal and his lungs were clear. (Id.). No peripheral edema was

noted. (Id.). Dr. Nagy continued plaintiff's medications and referred plaintiff to a cardiologist.

---

[14]Avandia is indicated for the treatment of type II diabetes mellitus. See PDR at 1475.

[15]Chronic renal failure is a slowly worsening loss of the ability of the kidneys to remove wastes, concentrate urine, and conserve electrolytes. Unlike acute renal failure, chronic renal failure slowly gets worse. It most often results from any disease that causes gradual loss of kidney function. It can range from mild dysfunction to severe kidney failure. See Medline Plus, (updated August 14, 2007)< http://www.nlm.nih.gov/medlineplus/ency/article/000471.htm>.

[16]Actos is indicated for the treatment of type II diabetes mellitus. See PDR at 3182.

(Id.).

On April 18, 2001, plaintiff reported varying blood sugar levels. (Tr. 712). Plaintiff's weight was 234, down from 245. (Id.). Plaintiff's heart rate and rhythm were regular and his lungs were clear. (Id.). No peripheral edema was noted. (Id.). Dr. Nagy's assessment was Type II diabetes, hypertension, and chronic renal failure. (Id.). He continued plaintiff's medications. (Id.).

On July 25, 2001, plaintiff reported feeling fairly well overall. (Tr. 711). Plaintiff's heart rate and rhythm were regular without murmurs, rubs, or gallops. (Id.). Plaintiff's lungs were clear and no peripheral edema was noted. (Id.). Dr. Nagy's assessment was Type II Insulin Dependent Diabetes, hypertension with chronic renal failure, and impotence. (Id.). He continued plaintiff's medications. (Id.).

On October 31, 2001, plaintiff voiced no complaints. (Tr. 710). Plaintiff had undergone an angiograph, which revealed a delayed uptake in the vascular supply. (Id.). Further cardiac evaluation was recommended. (Id.). Plaintiff's heart rate and rhythm were without murmurs, rubs, or gallops, and his lungs were clear. (Id.). No edema of the extremities was noted. (Id.). Dr. Nagy's assessment was peripheral vascular disease,[17] Type II insulin dependent diabetes, and hyperlipidemia. (Id.).

On January 6, 2002, plaintiff complained of sinus infection, which had recurred. (Tr. 706). Dr. Nagy's assessment was sinusitis. (Id.).

On February 13, 2002, plaintiff complained of nasal stuffiness, congestion, and cough.

---

[17]Any disease or disorder of the circulatory system outside of the brain and heart. See Stedman's at 1463.

(Tr. 709). Plaintiff's blood sugars were under good control. (Id.). Plaintiff's physical examination was normal. (Id.). Dr. Nagy's assessment was hyperlipidemia, Type II diabetes, and sinusitis. (Id.).

On May 15, 2002, plaintiff complained of a sore throat and left ear pain. (Tr. 708). Plaintiff's physical examination was normal. (Id.). Dr. Nagy's assessment was Type II diabetes, hypertension, and chronic renal failure. (Id.).

### Evidence Dated After the Expiration of Plaintiff's Insured Status

On August 28, 2002, plaintiff complained of some increasing dyspnea and increased lower extremity swelling over the last couple of months. (Tr. 707). Lower extremity edema was noted on examination. (Id.). Dr. Nagy's assessment was Type II diabetes with chronic renal insufficiency and onychomycosis.[18] (Id.).

On October 2, 2002, plaintiff complained of shortness of breath and wheezing. (Tr. 707). A chest x-ray revealed a somewhat enlarged heart. (Id.). Dr. Nagy recommended Albuterol[19] and Levaquin.[20] (Id.).

Plaintiff saw Dr. Braxton on September 19, 2002, for evaluation of polycystic kidney disease. (Tr. 600). Dr. Braxton noted swelling in plaintiff's legs. (Id.).

On January 29, 2003, Dr. Braxton's assessment was polycystic kidney disease and diabetic neuropathy. (Tr. 599). A review of systems revealed no visual complaints, no cardiovascular

---

[18]Very common fungus infections of the nails, causing thickening, roughness, and splitting. Stedman's at 1367.

[19]Albuterol is indicated for prevention and relief of bronchospasm. See PDR at 3064.

[20]Levaquin is indicated for the treatment of severe infections, such as sinusitis or pneumonia. See PDR at 2468.

palpitations, no dyspnea, no bone pain, no neurological complaints, no depression, and no hematological or lymphatic complaints. (Tr. 598).

Plaintiff saw Joe M. Chehade, M.D., at the Cape Girardeau Diabetes Clinic on June 13, 2003, for evaluation of his diabetes. (Tr. 754). Dr. Chehade found that plaintiff was tolerating Actos without significant swelling or water retention. (Id.). Dr. Chehade noted that plaintiff was followed by Dr. Braxton for his polycystic kidney disease with chronic renal failure. (Id.). Dr. Chehade reviewed with plaintiff the importance of blood glucose control. (Id.). He stated that plaintiff was doing pretty well on the maximum dosage of Actos. (Id.). Dr. Chehade diagnosed plaintiff with retinopathy[21] and mild peripheral neuropathy. (Id.). Dr. Chehade continued plaintiff on his diabetes regimen. (Id.).

Plaintiff saw Ray E. Peters, D.O. on December 1, 2003, for a consultation. (Tr. 635). A review of systems revealed no weakness, bone pain, numbness, breathing problems or increased edema. (Id.). Plaintiff's diagnoses were listed as anemia,[22] diabetes, and polycystic kidneys. (Id.). Upon physical examination, plaintiff had a normal mood, normal affect, no acute distress, normal respiration and no abnormalities of the extremities. (Tr. 636).

Plaintiff saw Dr. Peters for an evaluation on January 21, 2004, at which time plaintiff's diagnoses were listed as anemia of chronic disorders, diabetes, polycystic kidneys, leukopenia,[23]

---

[21]Noninflammatory degenerative disease of the retina. Stedman's at 1683.

[22]Any condition in which the number of red blood cells, the amount of hemoglobin of blood and/or the volume of packed red blood cells of blood are less than normal. Stedman's at 78.

[23]Any situation in which the total number of leukocytes in the circulating blood is less than normal. Stedman's at 1077.

thrombocytopenia,[24] and renal dysfunction. (Tr. 623).

Plaintiff presented to Dr. Braxton on April 7, 2004, with symptoms of nausea and vomiting, nose bleeds, metallic taste in the mouth, difficulty hearing, and new onset of weight loss. (Tr. 576). Plaintiff's diagnosis was polycystic kidney disease and diabetic nephropathy[25] as the source of progressive end stage renal disease. (Id.). Plaintiff was admitted to St. Francis Medical Center for dialysis therapy. (Id.).

Plaintiff underwent emergency kidney dialysis at St. Francis Medical Center on April 8, 2004. (Tr. 580).

Plaintiff began undergoing kidney dialysis approximately three times a week at Poplar Bluff Dialysis Center on June 1, 2004. (Tr. 378-441).

Donald E. Edwards, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on June 30, 2004. (Tr. 112-19). Dr. Edwards expressed the opinion that during the time period of December 15, 1997 through June 30, 2002, plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and push or pull an unlimited amount. (Tr. 113). Dr. Edwards found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 114-16).

### The ALJ's Determination

The ALJ made the following findings:

---

[24]A condition in which an abnormally small number of platelets is present in the circulating blood. Stedman's at 1984.

[25]A syndrome characterized by the presence of protein in the urine, hypertension, and progressive renal insufficiency. See Stedman's at 1291.

1.    The claimant met the disability insured status requirements of the Social Security Act on February 15, 1997.

2.    The claimant's date last insured was June 30, 2002.

3.    The claimant has not engaged in substantial gainful activity since at least February 15, 1997.

4.    Through his date last insured of June 30, 2002, the claimant had the severe impairments of polycystic kidney disease, hypertension, chronic renal failure, insulin dependent diabetes mellitus type II, hyperlipidemia and evidence of some retinopathy and neuropathy. During that period, the claimant did not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

5.    The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive with respect to establishing disability prior to the expiration of his date last insured.

6.    From February 15, 1997 through June 30, 2002, the claimant's impairments precluded, at most: sitting more than six to eight hours per eight hour work day; standing and/or walking more than six to eight hours per eight hour work day; frequently lifting and carrying more than twenty five pounds; and occasionally lifting and carrying more than fifty pounds. The claimant did not have a severe mental impairment or severe combination of mental impairments during that period.

7.    The claimant could not perform any past relevant work, from February 1997 through June 30, 2002, as it was performed by the claimant or as it is performed within the economy.

8.    The claimant is fifty-nine years old and has at least a high school education.

9.    The claimant is without significant transferable skills within his residual functional capacity.

10.   Given the claimant's age, education, past relevant work and residual functional capacity, the claimant could perform work existing in significant numbers during the period from February 15, 1997 through June 30, 2002. This finding is based upon Medical Vocational Rules 203.21 and 203.14 of 20 CFR Part 404, Subpart P, Appendix 2.

11.     The claimant was capable of performing substantial gainful activity from February 15, 1997 through June 30, 2002. The claimant was not disabled from the alleged onset date and through June 30, 2002. (20 CFR 404.1520(g) and 20 CFR 416.920(g)).

12.     The claimant was not disabled prior to the expiration of his insured status. The claimant failed his burden of establishing otherwise. The claimant is not entitled to a Period of Disability and Disability Insurance Benefits.

(Tr. 20-21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on April 20, 2004, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits, and is not eligible for Supplemental Security Income Benefits, under Sections 216(I) and 223, and 1614(a)(3)(A), respectively, of the Social Security Act.

(Tr. 21).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The

reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to

do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in failing to use a medical expert and in failing to develop the medical record, as was required due to plaintiff's ambiguous onset of disability. Plaintiff also contends that the ALJ erred in determining the credibility of his subjective complaints of pain and limitation.  The undersigned will discuss plaintiff's claims in turn.

### 1.    Onset of Disability

Plaintiff argues that the existing evidence of onset is ambiguous.  Plaintiff contends that Social Security Ruling ("SSR") 83-20 thus required the ALJ to obtain a medical expert and further develop the medical record.  Defendant argues that the evidence was unambiguous.

In order to be entitled to a Period of Disability and Disability Insurance Benefits, a claimant must be insured for disability.  See 20 C.F.R. §§ 404.315, 404.320.  Thus, in order to receive disability insurance benefits, a claimant must show onset of disability before the expiration of insured status.  See Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998).  In this case, plaintiff must show an onset of disability prior to June 30, 2002, plaintiff's last date of insured status.

SSR 83-20 is a statement of the policy and process for determining the onset date of disability, and enumerates a number of factors to be considered, including: a claimant's allegations, work history, and medical evidence.  See SSR 83-20 at 1-2.  In pertinent part, SSR 83-20 provides:

> In determining the date of onset of disability, the date alleged by the individual should be used *if it is consistent with all the evidence available*.  When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy.  However, the established onset date must be fixed based on the facts and *can never be inconsistent with the medical evidence* of record.
>
> Precise Evidence Not Available -- Need for Inferences

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, *must have a legitimate medical basis*. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

...

The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the *impairment was sufficiently severe to prevent the individual from engaging in SGA* (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

SSR 83-20 at 2-3 (emphasis added). The date of diagnosis of the impairment is not necessarily equivalent to the onset date of disability. See Willbanks v. Secretary of Health & Human Services, 847 F.2d 301, 304 (6th Cir. 1988).

The ALJ found that as of August 2, 2005, plaintiff had end stage renal disease, diabetes mellitus, nephrosclerosis, polycystic kidney disease, status post diabetic retinopathy, divertricular disease, and multiple staph infections. (Tr. 15). The ALJ noted that as of April 2004, plaintiff had begun renal dialysis. (Id.). The ALJ found that plaintiff was likely disabled at the current time and that his impairments may even reach Medical Listing level. (Id.). The ALJ, however, found that plaintiff was not disabled prior to the expiration of his insured status and that plaintiff was therefore not entitled to a Period of Disability and Disability Insurance Benefits. (Id.).

In reaching this conclusion, the ALJ discussed the objective medical evidence in detail. The ALJ noted that plaintiff carried a diagnosis of type II diabetes mellitus as of April 1996 and

that plaintiff reported lower extremity edema in September 1996. (Tr. 16, 148, 147). Dr. Riffle noted insomnia, hypertension, and poorly controlled diabetes mellitus on May 14, 1997. (Tr. 16, 146). Dr. Nagy diagnosed chronic renal failure in July 2001. (Tr. 16, 711). Plaintiff received treatment for visual complaints from April 2000 through June 2004. (Tr. 16, 490-548). The ALJ noted that as of January 21, 2004, plaintiff carried the diagnoses of anemia, of chronic disorders, diabetes mellitus, polycystic kidneys, thrombocytopenia, and renal dysfunction. (Tr. 16, 624). The ALJ found, however, that plaintiff was essentially without severe complications arising from any renal disease, hypertension, diabetes mellitus or other impairment during the relevant period. (Tr. 16).

The ALJ noted that plaintiff was "doing well" as of July 2, 1996, and doing "reasonably well" and his diabetes was under better control as of September 25, 1996. (Tr. 16, 148, 147). Dr. Riffle noted that plaintiff was "finally on a diet" and that his extremities were normal on February 19, 1997. (Tr. 16, 147). Significantly, the ALJ pointed out that the record fails to document treatment received from June 1997 through the entirety of 1998. (Tr. 16). The ALJ noted that the record documents only intermittent treatment through 1999 and 2000. The ALJ pointed out that although chronic renal failure and insulin dependent diabetes mellitus were diagnosed on November 3, 2000, plaintiff was feeling much better by November 27, 2000, after switching medications. (Tr. 16, 714, 713). Plaintiff was "overall feeling fairly well" as of July 25, 2001. (Tr. 16, 711). On October 31, 2001, peripheral vascular disease was noted, although plaintiff voiced no new complaints and exhibited no edema, no ulcerations, and clear lungs. (Tr. 16, 710). Treatment notes from February 13, 2002 reported complaints only related to sinusitis, and plaintiff's blood sugars were under good control. (Tr. 17, 709). The ALJ noted that as of

May 15, 2002, plaintiff carried diagnoses of hypertension, chronic renal failure and diabetes, yet plaintiff's complaints were only related to a sinus infection. (Tr. 17, 708). Further, the ALJ noted that, although plaintiff underwent eye surgery, his visual acuity in December 2001 was 20/30, which is not indicative of severe and disabling retinopathy during the relevant period. (Tr. 17, 529).

The ALJ stated that it was not until August 28, 2002, after plaintiff's date last insured, that plaintiff complained of increasing dyspnea and lower extremity swelling. (Tr. 17, 707). The ALJ noted that, even as of January 2003, a review of systems revealed no visual complaints, no cardiovascular palpitations, no dyspnea, no gastrointestinal complaints, no bone pain, no neurological complaints, no depression, and no hematological and lymphatic complaints. (Tr. 17, 598). He further noted that in June 2003, about a year after plaintiff's date last insured, plaintiff had only a "mild" history of peripheral neuropathy. (Tr. 17, 754). Further, in December 2003, a review of systems revealed no significant complaints with respect to weakness, bone pain, numbness, breathing, increased edema, or abnormalities with the extremities. (Tr. 17, 635-36).

The ALJ found that, through plaintiff's date last insured, he had the severe impairments of polycystic kidney disease, hypertension, chronic renal failure, insulin dependent diabetes mellitus type II, hyperlipidemia, and evidence of some retinopathy and neuropathy. (Tr. 15). The ALJ concluded that these impairments were not disabling through the relevant period. This finding is supported by the objective medical record, as discussed above.

Plaintiff argues that the ALJ was required to obtain a medical expert due to the ambiguous onset evidence. The medical evidence, however, was not ambiguous. The evidence reveals that plaintiff's impairments were not disabling prior to the expiration of his insured status on June 30,

2002.  Rather, plaintiff received only conservative treatment through his date last insured and for a significant period thereafter.  As such, the ALJ was not required to obtain a medical expert.  See Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997) (unambiguous medical records obviates the need for a medical advisor).

Plaintiff also contends that the ALJ was required to further develop the medical record.  Specifically, plaintiff argues that the ALJ failed to obtain a treating source statement from Dr. Nagy and failed to obtain a full medical record from Dr. Braxton.

It is true that the ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel.  See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981).  However, this inquiry is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record.  See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993).  While an ALJ has the duty to develop the record independent of the claimant's burden, the burden of persuasion to prove disability remains on the claimant.  See Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir. 2004).

Here, no crucial issue was left undeveloped.  There was ample medical evidence in the record for the ALJ to review in making his determination.  Although plaintiff contends that the ALJ failed to obtain medical evidence from Drs. Nagy and Braxton, the medical record contains records from both doctors.  The evidence in the record is sufficient to support the ALJ's decision.  Further, the ALJ left the record open after the administrative hearing so that plaintiff could submit additional medical evidence.  If plaintiff thought additional medical evidence was necessary, he could have obtained the evidence and submitted the evidence at that time.  Thus, plaintiff's argument that the ALJ failed to adequately develop the record lacks merit.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## 2.     **Credibility Analysis**

Plaintiff next argues that the ALJ erred in discrediting his subjective complaints of pain and limitation.  Defendant contends that the ALJ properly assessed plaintiff's credibility.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

In his opinion, the ALJ specifically cited the relevant Polaski factors.  (Tr. 15).  The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain.  The ALJ first stated that the medical

evidence does not support plaintiff's subjective complaints of disabling impairments prior to his date last insured. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). As discussed above, the ALJ properly found that plaintiff received only conservative treatment prior to his date last insured and for a significant period thereafter.

The ALJ pointed out that none of plaintiff's treating physicians imposed any functional limitations on plaintiff during the relevant period. (Tr. 18). The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). The ALJ also noted that plaintiff was not prescribed the use of an assistive device for ambulation or participated in physical therapy, a work hardening program, or a pain clinic prior to his date last insured. (Tr. 18).

The ALJ next stated that, as discussed above, plaintiff did not seek regular medical treatment for a large part of 1997 and most of 1998 and 1999. (Tr. 18). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ properly found that plaintiff's failure to seek regular medical treatment during a significant part of the relevant period was inconsistent with his claims of disabling impairments.

The ALJ next discussed the side effects of plaintiff's medications. The ALJ stated that there is no evidence that plaintiff suffered side effects resulting in limitations of functional capacity

that were not controlled by medication adjustments during the relevant period. (Tr. 18). The side effects of medications is a proper Polaski factor. See Polaski, 739 F.2d at 1322.

The ALJ then discussed plaintiff's daily activities. The ALJ properly stated that although plaintiff alleges many significant limitations of daily activities, allegations of disability are not self-proved.

The ALJ finally discussed plaintiff's earnings records. The ALJ properly credited plaintiff for his "fair to good" yearly earnings, while noting that the majority of the credibility factors weighed against plaintiff. (Tr. 19). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient.

After assessing plaintiff's credibility, the ALJ formulated the following residual functional capacity:

> The undersigned finds that the record establishes that, from February 15, 1997 through June 30, 2002, the claimant's impairments precluded, at most: sitting more than six to eight hours per eight hour work day; standing and/or walking more than six to eight hours per eight hour work day; frequently lifting and carrying more than twenty five pounds; and occasionally lifting and carrying more than fifty pounds. These findings are consistent with medical and non-medical facts set forth above in detail, as well as the findings by Dr. Edwards. The record does not establish the existence of any other persistent, significant, and adverse

limitation of function due to any other ailment.

(Tr. 19).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer**,** 245 F.3d at 704.

Plaintiff argues that the ALJ erred in relying on the opinion of the non-examining state agency physician, Dr. Edwards. The ALJ did indicate that his residual functional capacity determination was consistent with the opinion of Dr. Edwards. The ALJ, however, also stated that this determination was supported by the medical and non-medical evidence in the record. The undersigned agrees that the residual functional capacity formulated by the ALJ is supported by the record as a whole. The objective medical record is not supportive of any greater limitations. Notably, none of plaintiff's treating physicians imposed any functional limitations during the relevant period.

Accordingly, the undersigned recommends that the decision of the Commissioner be

affirmed.


## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying

plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of

the Social Security Act be **affirmed**.


The parties are advised that they have eleven (11) days, until August 22, 2008, in which

to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1),

unless an extension of time for good cause is obtained, and that failure to file timely objections

may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d

356, 357 (8th Cir. 1990).


Dated this   11th   day of August, 2008.


LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE